## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

EDWIN ISHOO, M.D.,

    Plaintiff,

vs.             No. CIV-06-0747 MV/ACT

BOARD OF REGENTS, UNIVERSITY
OF NEW MEXICO; PAUL ROTH, M.D.;
JORGE WERNLY, M.D.; MICHAEL
SPAFFORD, M.D.; SCOT SAUDER;
FRED HASHIMOTO, M.D.; and
ROBERT BAILEY, M.D.,

    Defendants.

### <u>MEMORANDUM OPINION AND ORDER</u>

 **THIS MATTER** comes before the Court on Defendants Board of Regents of the University of New Mexico, Paul Roth, Jorge Wernly, Michael Spafford, Fred Hashimoto, and Robert Bailey's Motion to Dismiss Plaintiff's Second Amended Complaint on the Basis of Qualified Immunity and Other Grounds, filed October 10, 2006, **[Doc. No. 28],** Defendant Sauder's Second Motion to Dismiss, filed October 10, 2006, **[Doc. No. 32]**, Plaintiff's Motion to File Surreply, filed November 14, 2006, **[Doc. No. 53]**, Defendants' Motion to Strike Plaintiff's Rule 56 Affidavit, filed October 10, 2006, **[Doc. No. 27]**, and Defendants' Motion to Strike Plaintiff's Second Rule 56 Affidavit, filed November 10, 2006, **[Doc. No. 48]**.

## FACTUAL BACKGROUND[1]

Plaintiff Edwin Ishoo, who is of Middle Eastern heritage, is a licensed medical doctor specializing in head and neck surgical oncology.  Plaintiff was hired by the University of New Mexico ("UNM") as a surgeon and faculty member pursuant to a written contract dated August 23, 2005.  When he began work in September of 2005, Plaintiff was assigned to the Veteran's Administration Hospital ("VA").[2]  Plaintiff alleges that shortly after he began working at the VA, VA staff members started discriminating against him because of his nationality and race.  According to Plaintiff, support staff at the VA unilaterally canceled Plaintiff's surgeries with short notice, referred to him as a "rag head," and made other derogatory statements about him.  Plaintiff reported the discriminatory acts to the VA Chief of Surgery, who is not a defendant in this case, as well as Defendant Michael Spafford, Chief of the Division of Otolaryngology at UNM, and Defendant Jorge Wernly, Chairman of the Department of Surgery at UNM Health Services Center, but no action was taken.

At some point during his employment, Plaintiff also expressed concerns to Defendants Wernly and Spafford about what he considered improper billing practices at the VA and the lack of a core curriculum in the medical residency program at UNM.

On December 21, 2005, Plaintiff received a successful six month evaluation from UNM's Credential Committee.

On February 24, 2006, Plaintiff reported a nurse at the VA to the VA's head nurse and to

---

[1]  On a motion to dismiss, the court must assume as true all well-pleaded facts, and must draw all reasonable inferences in favor of the plaintiff.  *See Housing Auth. of the Kaw Tribe v. City of Ponca City*, 952 F.2d 1183, 1187 (10th Cir. 1991).  Consequently, the factual background recites the facts as alleged in Plaintiff's Second Amended Complaint.

[2]  The Veterans Administration Hospital is affiliated with UNM Health Sciences Center.

security because the nurse referred to Plaintiff as a "rag head."  Unidentified VA officials, without permitting Plaintiff to explain what happened, requested that Plaintiff leave the hospital and never return.[3]  When Plaintiff reported this incident to Defendants Wernly and Spafford, they allegedly threatened his job and his career and removed him from active medical practice. Apparently, Plaintiff still was permitted to perform his clinical duties.

While the exact sequence of events is unclear from the Second Amended Complaint, over the next few weeks Plaintiff filed written complaints of discrimination and retaliation against the VA, UNM, Dr. Wernly, and Dr. Spafford.  Approximately six days after Plaintiff filed charges of discrimination and retaliation against UNM, Dr. Wernly, and Dr. Spafford with the New Mexico Human Rights Department, UNM's Medical Staff Credential's Committee, chaired by Dr. Bailey, recommended to the Medical Executive Committee that Plaintiff be investigated by an ad hoc investigation committee ("AHIC") due to the February 2006 incident at the VA and Plaintiff's overall performance and professionalism.  *See* Second Amended Complaint at ¶ 42 ( Dr. Bailey "sent a memorandum to Dr. Hashimoto requesting that the AHIC be formed" to investigate Plaintiff).

On April 14, 2006, UNM's senior in-house counsel suggested that the parties attempt to resolve the dispute through mediation.  Plaintiff agreed to the requested mediation and further agreed to withhold filing a lawsuit until after the mediation.  According to Plaintiff, Defendant Sauder, the in-house attorney assigned to the AHIC investigating Plaintiff, and Defendants Roth, Spafford, and Wernly intentionally prevented the mediation from taking place and encouraged the Medical Executive Committee to proceed with an investigation.

---

[3]  While VA officials requested that Plaintiff never return to the hospital, they did not take any official action to revoke Plaintiff's medical privileges at the VA.

On April 19, 2006, the Medical Executive Committee, apparently acting through Dr. Hashimoto, placed Plaintiff on indefinite leave with pay and referred him to an AHIC. [4] *See* Second Amended Complaint at ¶ 43 (Dr. Hashimoto "accepted Dr. Bailey's request for an AHIC").  Plaintiff alleges that Defendants did not follow UNM professional review policies and procedures in instituting the AHIC.  Specifically, Plaintiff alleges that all the individually named defendants failed to provide Plaintiff with notice of the request for an ad hoc investigation, denied Plaintiff an opportunity to participate in the investigation, and refused to provide him with information regarding the facts or charges related to his performance or professionalism (other than the incident at the VA) that were being investigated.  Plaintiff further alleges that Defendant Sauder threatened and intimidated AHIC members, including the member chosen by Plaintiff, unilaterally removed two members of the AHIC, which deprived Plaintiff of a fair and impartial investigation, and solicited statements from hospital employees regarding Plaintiff's conduct.

Plaintiff further asserts that he is being treated differently than other similarly situated physicians/faculty members who have had their professionalism or performance questioned and that he and another physician of Middle Eastern descent employed by UNM have been discriminated against and subjected to disparate treatment.

Plaintiff contends that his removal from medical practice has adversely affected his

---

[4]  The exact date the administrative leave was imposed is unclear.  Plaintiff alleges that the Medical Executive Committee placed him on administrative leave and referred him to the AHIC on April 19, 2006.  Apparently Plaintiff obtained a temporary restraining order from a state court presiding over a separate lawsuit Plaintiff filed against UNM that prevented Defendants from immediately imposing administrative leave.  At some point, however, the temporary restraining order was set aside and Plaintiff was relieved of all his duties and placed on paid administrative leave.

reputation and standing in the medical community and that the prolonged placement on administrative leave threatens to erode his technical skills as a head and neck surgeon, threatens his ability to maintain his medical license, and has caused him loss of income and benefits.

On June 29, 2006, Plaintiff was offered another annual contract by UNM that contained no pay increases and what Plaintiff viewed as unreasonable and onerous productivity requirements.  According to Plaintiff, the terms and conditions of the contract were much less favorable than contracts offered to similarly situated physicians with less experience, training and knowledge.

On August 17, 2006, Plaintiff filed this action in state court.  Defendants removed the action to federal court and filed motions to dismiss.  Plaintiff simultaneously filed both responses to the motions to dismiss and a First Amended Complaint.  Five days later, Plaintiff filed a Second Amended Complaint.[5]  Plaintiff's Second Amended Complaint contains 11 counts:  1) retaliation for protected speech in violation of 42 U.S.C. § 1983; 2) discrimination based on race in violation of 42 U.S.C. § 1981; 3) conspiracy to deprive Plaintiff of civil rights due to his race in violation of 42 U.S.C. § 1985(3); 4) denial of equal protection in violation of 42 U.S.C. § 1983; 5) denial of due process in violation of 42 U.S.C. § 1983; 6) denial of liberty interests in violation of 42 U.S.C. § 1983; 7) preliminary injunctive relief; 8) discrimination in violation of the New Mexico Human Rights Act ("NMHRA"); 9) retaliation in violation of the NMHRA; 10) discrimination based on race in violation of Title VII; and 11) retaliation for

---

[5]  Plaintiff did not have permission of the Court or consent of counsel to file either amended complaint.  Because, however, it appears that the Defendants have *ex post facto* consented to the amendments, the Court will accept the amended complaints.  Plaintiff is cautioned, however, that future non-compliance with court rules and procedures will not be treated so leniently.

protected speech in violation of Title VII..[6]  Defendants seek dismissal of all claims on numerous grounds, including qualified immunity.

## LEGAL STANDARD

In considering a Rule 12(b)(6) motion, the court must assume as true all well-pleaded facts, and must draw all reasonable inferences in favor of the plaintiff.  *Housing Auth. of the Kaw Tribe v. City of Ponca City*, 952 F.2d 1183, 1187 (10th Cir. 1991).  The issue in reviewing the sufficiency of a complaint is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support his/her claim.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  In making this determination, the Court is looking for "plausibility in th[e] complaint."  *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1970 (2007).

These deferential rules, however, do not allow the court to assume that a plaintiff "can prove facts that [he/she] has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged."  *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983).  "[G]ranting a motion to dismiss is 'a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice.'"  *Cayman Exploration Corp. v. United Gas Pipe Line Co*., 873 F.2d 1357, 1359 (10th Cir. 1989) (quoting *Morgan v. City of Rawlins*, 792 F.2d 975, 978 (10th Cir. 1986)).

## DISCUSSION

Plaintiff's Second Amended Complaint does not state whether Plaintiff has named the

---

[6]  Counts I through VI of Plaintiff's Complaint are asserted against all individual defendants; Count VII is asserted against all defendants; Counts VIII and IX are asserted against the UNM Board of Regents, Dr. Wernly and Dr. Spafford; and Counts X and XI are asserted against the UNM Board of Regents.

individual defendants in their official or individual capacities or both.  When a complaint is

ambiguous regarding the capacity in which a defendant is sued, a defendant's status is

determined by "reviewing the course of the proceedings."  *Houston v. Reich*, 932 F.2d 883, 885

(10th Cir. 1991).  While the allegations in the Complaint suggest that the individual defendants

are named solely in their individual capacities, the Complaint is sufficiently ambiguous that the

Court also will consider whether Plaintiff has stated a claim against the individual defendants in

their official capacities.

## I.      Eleventh Amendment Immunity

The Eleventh Amendment to the United States Constitution bars suits in federal court for

damages against states, state agencies, and state officials in their official capacities unless the

state unequivocally waives its immunity or Congress expressly abrogates the immunity by

creating a statutory cause of action.  *See Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 73

(2000);  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 9, 97-102 (1984).  "Because the

State's assertion of Eleventh Amendment immunity challenges the subject matter jurisdiction of

the district court, the issue must be resolved before a court may address the merits of [a

plaintiff's] underlying . . . claim."  *Martin v. Kansas*, 190 F.3d 1120, 1126 (10th Cir. 1999),

overruled on other grounds by *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001).

Unless a state waives its immunity by consenting to suit or Congress has abrogated the

state's sovereign immunity, "the Eleventh Amendment prohibits a citizen from filing suit against

a state in federal court."  *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002) (citation

omitted).  The State of New Mexico and its officials have not consented to be sued in this case.

In addition, the Supreme Court has determined that the passage of 42 U.S.C. §§ 1981, 1983,

1985 and 1986 did not abrogate state sovereign immunity.  *See, e.g., Quern v. Jordan*,

440 U.S. 332, 345 (1979) (Congress did not abrogate state sovereign immunity in enacting

42 U.S.C. § 1983); *Singletary v. Missouri Dept. of Corrections*, 423 F.3d 886, 890 (8th Cir.

2005) (same as to § 1981); *Seibert v. Oklahoma*, 867 F.2d 591, 594 (10th Cir. 1989), abrogated

on other grounds by *Federal Lands Legal Consort. ex rel. Robart Estate v. United States*, 195

F.3d 1190 (10th Cir. 1999) (same as to § 1985 & § 1986).  As officers or arms of the state,

Defendant UNM Board of Regents and the individual defendants sued in their official capacities

are entitled to Eleventh Amendment immunity.[7]  For these reasons, all claims asserted against

Defendant UNM Board of Regents and all claims seeking damages asserted against the

individual defendants in their official capacities must be dismissed without prejudice for lack of

subject matter jurisdiction.[8]

## II.  Section 1983 Official Capacity Claims

All of the individual defendants are officers or employees of the State of New Mexico.

The Supreme Court has held that neither states nor state employees sued in their official

capacities are "persons" within the meaning of 42 U.S.C. § 1983.  *See, e.g., Will v. Michigan

Department of State Police*, 491 U.S. 58, 71 (1989) ("A suit against a state official in his or her

official capacity is not a suit against the official but rather is a suit against the official's office.

As such, it is no different from a suit against the State itself.")(internal cites and quotes omitted);

---

[7]  Defendant UNM Board of Regents is the corporate body empowered to control and manage UNM pursuant to New Mexico law.  The individual defendants are officers appointed by the Board of Regents (Paul Roth) or employees of UNM (Jorge Wernly, Michael Spafford, Fred Hashimoto, Robert Bailey, and Scot Sauder).

[8]  The Eleventh Amendment does not prohibit suits against state officials for prospective injunctive relief.  *See Ex Parte Young*, 209 U.S. 123, 159-60 (1908); *Thompson v. Colorado*, 278 F.3d 1020, 1024 (10th Cir. 2001).  In his Second Amended Complaint, Plaintiff requests preliminary injunctive relief but does not seek any permanent prospective injunctive relief.

*see also Harris v. Champion*, 51 F.3d 901, 906 (10th Cir. 1995)("a state official who acts in his or her official capacity" is not a "person" under § 1983). Consequently, Plaintiff's § 1983 claims against the individual defendants in their official capacities are barred and will be dismissed.[9]

### III.  Sections 1981, 1983, 1985 and 1986 Individual Capacity Claims

Defendants' motions seek the dismissal of the 42 U.S.C. §§ 1981, 1983, 1985, and 1986 individual capacity claims against Defendants Bailey, Roth, Hashimoto and Sauder on the grounds that the allegations against these four defendants are insufficient to state a claim.

"[U]nder § 1983, a defendant may not be held liable under a theory of *respondeat superior*. Instead, a plaintiff must show that an affirmative link exists between the constitutional deprivation and either the defendant's personal participation, his exercise of control or direction, or his failure to supervise." *Ledbetter v. City of Topeka*, 318 F.3d 1183, 1187 (10th Cir. 2003) (quotations and citation omitted); *see also Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996) (supervisor status insufficient by itself to support liability under § 1983; rather, personal participation of defendant is essential). The same standard applies to § 1981 and § 1985 claims. *See, e.g., Davis v. Reed*, 462 F.Supp. 410, 413 (W.D. Okla. 1977)("The doctrine of *respondeat superior* has no application in civil rights suits."); *Draeger v. Grand Central, Inc*., 504 F.2d 142, 145 (10th Cir. 1974)("Generally speaking, the doctrine of vicarious liability or *respondeat superior* has been ruled out in cases arising under the Federal Civil Rights statutes."). Consequently, Plaintiff must specify how the individual defendants personally participated in

---

[9]  Section 1983 claims that seek prospective injunctive relief may be brought against state employees in their official capacities. *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 167, n. 14 (1985) ("official-capacity actions for prospective relief are not treated as actions against the State."). Plaintiff's § 1983 claims, however, seek only damages.

any alleged violations of these statutes.  *See Smith v. Plati*, 258 F.3d 1167, 1176 (10th Cir. 2001)

("[P]laintiffs must allege sufficient facts to support their § 1983 claims.  Bare conclusions, even

read in the light most favorable to plaintiff, may prove insufficient."); *Phelps v. Wichita*

*Eagle-Beacon*, 886 F.2d 1262, 1270 (10th Cir. 1989) ("[C]onclusory allegations . . . are

insufficient to state a claim under the First Amendment.").

    A.  Dr. Roth

    Dr. Roth is the Executive Vice President of the Health Sciences Center at UNM.  The

only specific allegations Plaintiff makes against Dr. Roth are 1) that in June of 2006, Plaintiff

"was offered another annual contract by UNM through defendants Roth and Hashimoto" that did

not include a pay increase, had unreasonable and onerous productivity requirements, and was

less favorable than contracts offered to similarly situated physicians with less experience,

training, and knowledge and 2) that Dr. Roth intentionally prevented a mediation from taking

place and encouraged the Medical Executive Committee to proceed with an investigation of

Plaintiff.[10]

---

    [10]  Plaintiff generally asserts that all individual defendants failed to follow UNM's notice
requirements for the AHIC and refused to provide Plaintiff with the underlying facts and charges
(other than the February 24, 2006 incident at the VA) being investigated by the AHIC despite a
duty to do so under UNM policies.  Plaintiff does not allege how the failure to follow UNM's
notice and disclosure requirements for the AHIC deprived him of any constitutional rights.  *See,
e.g., Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 522 (10th Cir. 1998) (an employer's
failure to follow its established guidelines in overseeing a grievance "does not in and of itself
implicate constitutional due process concerns.") (quoting *Purisch v. Tennessee Technological
University*, 76 F.3d 1414, 1423 (6th Cir. 1996)).  Assumably, Plaintiff is asserting that the lack
of notice of the investigation violates his due process rights.  The Tenth Circuit has held,
however, that an investigation conducted without notice of the charges being investigated, or
even without notice that an investigation is being conducted, does not implicate procedural due
process if an employee receives notice of the charges and a meaningful opportunity to respond
after the investigation.  *See Derstein v. Kansas*, 915 F.2d 1410 (10th Cir. 1990) (not advising
plaintiff that an investigation was underway and that complaints against him were being solicited
did not violate procedural due process because after the investigation was completed plaintiff

Notably, Plaintiff does not allege that Dr. Roth had any control over the terms in the annual contract; that Plaintiff had a constitutional right to a mediation; or that Plaintiff had a constitutional right not to be investigated for misconduct.  In short, Plaintiff has failed to allege an affirmative link between Dr. Roth and a constitutional deprivation and the claims against Dr. Roth will be dismissed.

B.  Dr. Hashimoto

Dr. Hashimoto is Chief of Staff of the Health Sciences Center of UNM.  In addition to the allegation above regarding the offering of an annual contract, Plaintiff alleges that Dr. Hashimoto "accepted Dr. Bailey's request for an AHIC."  Plaintiff, who does not allege that Dr. Hashimoto had any control over the terms in the annual contract, fails to establish a link between the offering of the contract and the deprivation of a constitutional right.  In addition, as discussed below, conducting an investigation into possible misconduct, including an incident that resulted in Plaintiff being barred from the VA hospital, does not, standing alone, implicate any constitutional rights.  Consequently, the allegation that Dr. Hashimoto accepted Dr. Bailey's request for an investigation is insufficient to state a claim that a constitutional right has been violated.

Plaintiff has failed to allege an affirmative link between Dr. Hashimoto and any alleged constitutional deprivations and the claims against Dr. Hashimoto must be dismissed.

C.  Dr. Bailey

Dr. Bailey is an associate professor in the department of psychiatry at UNM and also

---

received a termination letter that notified him of the nature of the charges against him and provided him an opportunity for a hearing).  At this point, the investigation is on-going so a procedural due process claim is premature.

serves as the Acting Dean of Clinical Affairs and as the Chair of the Medical Staff Credentials Committee.  In his Second Amended Complaint, Plaintiff alleges that rather than handle the complaints regarding Plaintiff informally, which was the general practice, Dr. Bailey sent a memorandum to Dr. Hashimoto requesting that an AHIC be formed to review Plaintiff's "overall performance and professionalism."  Plaintiff alleges that by doing so, Dr. Bailey did not "follow written policies and procedures, and usual and customary practices of UNM."   Plaintiff fails to allege, however, that Dr. Bailey's failure to follow UNM's policies and procedures resulted in Plaintiff suffering the deprivation of a constitutional right.  *See Tonkovich*, 159 F.3d at 522 (an employer's failure to follow its established guidelines in overseeing a grievance "does not in and of itself implicate constitutional due process concerns").  Furthermore, as discussed below, conducting an investigation into possible misconduct does not, standing alone, implicate any constitutional rights.  Absent an affirmative link between Dr. Bailey and an alleged constitutional deprivation, the claims against Dr. Bailey must be dismissed.

D.  Scot Sauder

 Plaintiff's allegations against Defendant Sauder, while more extensive, still fail to implicate a constitutional right.  Plaintiff alleges that Defendant Sauder:

1) was the attorney assigned to the AHIC investigating Plaintiff;

2) allowed Plaintiff to have an attorney present during certain proceedings related to the investigation but did not allow the attorney to actively participate;

3) "intentionally interfered with and prevented" a scheduled mediation from occurring;

4) "threatened and intimidated AHIC members, one of which [sic] was chosen by [Plaintiff];" and "initiated unilateral removal of two members of the AHIC, thereby depriving [Plaintiff] of a fair and impartial investigation;"

5)  "pro-actively solicited statements from hospital employees that [Plaintiff] engaged in unprofessional conduct;" and

6)  "informed [Plaintiff's] counsel 'during the pendency of his administrative leave [Plaintiff] is to remain off University premises unless his presence is officially requested or required in order for him to participate in the professional review process, or unless he has permission from his supervisor, Dr. Spafford."

Plaintiff does not allege any connection between Defendant Sauder's acts and the deprivation of a constitutional right.  The allegation that Defendant Sauder was assigned to the AHIC does not implicate a constitutional right.  The allegation that Defendant Sauder did not allow Plaintiff's attorney to actively participate in an unidentified proceeding held as part of the investigation is insufficient to implicate a constitutional right.  Plaintiff does not identify any right, much less a constitutional right, to have an attorney participate in an employer's investigation into possible misconduct.  *See, e.g., Hannah v. Larche*, 363 U.S. 420, 442-43, 80 S.Ct. 1502, 1515, 4 L.Ed.2d 1307 (1960) ("[W]hen governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used.... [T]he investigative process could be completely disrupted if investigative hearings were transformed into trial-like proceedings."); *see also SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 742, 104 S.Ct. 2720, 2725, 81 L.Ed.2d 615 (1984) ("The Due Process Clause is not implicated under such circumstances because an administrative investigation adjudicates no legal rights...."); *SEC v. Meek,* Fed. Sec. L. Rep. (CCH) P97,323 (10th Cir.1980) (per curiam) ("when administrative agencies 'are conducting nonadjudicative, factfinding investigations, rights such as appraisal, confrontation, and cross-examination generally do not obtain.' ") (quoting *Hannah*, 363 U.S. at 445-46).

13

Plaintiff argues in his response that Defendant Sauder is responsible for his placement on administrative leave because Defendant Sauder prevented the scheduled mediation from occurring.  This allegation does not implicate a constitutional right.  Plaintiff has not identified any constitutional right to mediation and, even assuming Defendant Sauder was responsible for the placement of Plaintiff on paid administrative leave, the placement of an employee on paid administrative leave pending an investigation, standing alone, does not implicate a constitutional right.

The allegation that Defendant Sauder "threatened and intimidated AHIC members, one of which [sic] was chosen by [Plaintiff]" and "initiated unilateral removal of two members of AHIC, thereby depriving [Plaintiff] of a fair and impartial investigation" is also inadequate to state a constitutional violation.  Plaintiff does not allege that the threats and intimidation deprived him of any constitutional right.  While Plaintiff does allege that the removal of two members of the AHIC deprived him of a fair and impartial investigation, he provides no factual allegations in support of this assertion.  Not only are the allegations of an unfair investigation conclusory but the investigation is on-going so any constitutional due process claim based on the adequacy of the investigation is premature.

The allegation that Defendant Sauder solicited statements about Plaintiff from other employees amounts to nothing more than a complaint that Defendant Sauder was doing his job.  Plaintiff has not identified how soliciting statements from employees as part of an investigation violates any of Plaintiff's constitutional rights.

Finally, the allegation that Defendant Sauder informed Plaintiff's counsel that Plaintiff was to remain off UNM premises during the pendency of the investigation unless he was needed to participate in the professional review process or unless he had permission from his supervisor

14

does not implicate a constitutional right.  As discussed below, removal of an employee from the workplace pending a timely investigation into alleged misconduct does not run afoul of the constitution.

Absent an affirmative link between Defendant Sauder's actions and the deprivation of a constitutional right, Plaintiff has failed to state a claim against Defendant Sauder and Defendant Sauder's motion to dismiss will be granted.

## IV.  Adverse Action

Defendants argue that Count I (§ 1981 race discrimination), Count IV (equal protection), Count VIII (NMHRA discrimination), and Count X (Title VII discrimination) must be dismissed because Plaintiff has not alleged an adverse employment action.  Discrimination and disparate treatment claims that are supported by indirect evidence of discrimination are examined under the familiar burden-shifting analysis first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and refined in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  Under the burden-shifting method, the plaintiff first has the burden of establishing a *prima facie* case of disparate treatment.  *McDonnell Douglas*, 411 U.S. at 802.  If the plaintiff succeeds in showing such a *prima facie* case, a presumption of illegal discrimination is created and the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged act.  *Id.*  If the defendant meets its burden by producing a "clear and reasonably specific" explanation for the conduct, *Burdine*, 450 U.S. at 258, the plaintiff may show that the reasons offered by the defendant were merely a "pretext" for discrimination, *McDonnell Douglas*, 411 U.S. at 804.  Throughout the process of applying the *McDonnell Douglas* test, courts must remain flexible because the test "was never intended to be rigid, mechanized, or ritualistic."  *Furnco Const. Corp. v. Waters*, 438 U.S. 567,

15

577 (1978).

To establish a *prima facie* case of disparate treatment or discrimination based on race under § 1981, § 1983, Title VII and the New Mexico Human Rights Act, a plaintiff must show that he suffered an adverse employment action.  *See Trujillo v. University of Colo. Health Science Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998).  Plaintiff's Second Amended Complaint alleges that the individual defendants "have taken adverse employment action against [him], including, but not limited to, placing him on administrative leave, banishing him from UNM premises, initiating an ad hoc professional review investigation, excluding him from performing his usual and customary work as a head and neck surgeon, threatening his job, and creating a hostile work environment."  Second Amended Complaint at ¶ 82.

The Tenth Circuit "liberally interprets" whether an adverse employment action exists and utilizes "a case-by-case approach, examining the unique factors relevant to the situation at hand" to determine if conduct rises to the level of an adverse employment action.  *Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1268 (10th Cir. 2005) (quotation omitted).  "Conduct rises to the level of adverse employment action when it constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Stinnett v. Safeway, Ins.*, 337 F.3d 1213, 1217 (10th Cir. 2003) (citations and internal quotations omitted). "An adverse employment action [is] not limited to those situations where a plaintiff can show loss of an actual job, but also ... encompass[es] those acts that carry a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032 (10th Cir. 2004) (citations and internal quotations omitted). "[A]n act by an employer that does more than *de minimis* harm to a plaintiff's future

employment prospects can, when fully considering the unique factors relevant to the situation at hand, be regarded as an adverse employment action, even where plaintiff does not show the act precluded a particular employment prospect." *Id.* at 1033 (citations and internal quotations omitted). A "mere inconvenience or an alteration of job responsibilities," however, is not considered an adverse employment action. *Sanchez v. Denver Pub. Schs*, 164 F.3d 527, 532 (10th Cir. 1998).

### A. Paid Administrative Leave

While the Tenth Circuit has not directly addressed the question, at least five other circuit courts have held that the imposition of paid administrative leave for a short period of time pending an investigation is not an adverse employment action because the "terms, conditions, or benefits of a person's employment do not typically, if ever, include general immunity from the application of basic employment policies" against employees who violate those rules. *Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001); *see also Joseph v. Leavitt*, 465 F.3d 87 (2nd Cir. 2006) (placement on administrative leave pending resolution of criminal charges did not constitute an adverse employment action); *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 892 (8th Cir. 2005) (placement on paid administrative leave pending an investigation does not constitute an adverse employment action); *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 803 (6th Cir. 2004) ("suspension with pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action"); *Von Gunten*, 243 F.3d at 869 (concluding that employer's placement of employee on short administrative leave with pay to allow time for internal investigation of complaint in accordance with procedures was not an adverse employment action); *Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir. 2000) (police officer who was placed on administrative leave with pay for less than three months

pending an investigation and then returned to work did not suffer an adverse employment action).  This is not a *per se* rule, however, and a court must look at all the circumstances and determine if there is any harm to employment status from the paid administrative leave.

In most cases, restoration of an employee to his or her original position at the end of a short paid suspension results in the employee suffering no loss in pay, benefits, or position. There are exceptions, however, particularly when the suspension is lengthy.  *See, e.g., Joseph v. Leavitt*, 465 F.3d 87, 92 (2nd Cir. 2006) ("We need not hold that suspensions during investigations will never rise to the level of an adverse employment action.  An exceptionally dilatory investigation might constitute a material change in the terms and conditions of employment."); *Watkins v. Henderson*, No. IP99-1945-C-B/S, 2001 WL 219807, at *11-12 (S.D. Ind. March 5, 2001) (placement on forced paid administrative leave for some five months possibly an adverse employment action because of concomitant loss of eligibility for certain benefits); *Flanagan v. Reno*, 101 F.Supp.2d 1022, 1026 n. 2 (N.D. Ill. 2000) (stating, in dicta, that "[a] long term administrative leave, which would deprive an employee of work, any chance to advance, and other benefits, probably could constitute adverse employment action").

The fact that Plaintiff was placed on paid administrative leave pending an investigation into alleged misconduct, standing alone, does not constitute an adverse employment action. Plaintiff's Second Amended Complaint, however, alleges that he was placed on paid administrative leave in April of 2006 pending an investigation into undisclosed issues regarding his "performance and professionalism" and, nearly six months later, was still on paid administrative leave with no end of the investigation in sight.  Although Plaintiff apparently continues to receive some compensation and benefits, he has been relieved of all job responsibilities, has ceased to function in his employment position or any other capacity, and has

18

not been permitted to come to the workplace.  His interaction with fellow employees has ceased, as has his medical research and any on-the-job experience and training he normally would have received.  Plaintiff further alleges that during this extended administrative leave, he has lost promotion opportunities, income and benefits.[11]

The elimination of all job responsibilities, all contact with co-workers, and all experience and education that would come from fulfilling one's job responsibilities for nearly a year could constitute a significant change in employment status if the extended nature of the administrative leave is due to an investigation that is dilatory.[12]  Furthermore, Plaintiff alleges that he has lost promotion opportunities, income, and benefits during this period.  These allegations, if proven, could support the finding of an adverse employment action.  Therefore, based on the allegations in the Complaint, the Court cannot conclude as a matter of law that Plaintiff's paid administrative leave is not an adverse employment action.  Defendants' motion to dismiss Counts II, IV, VIII, and X on the grounds that Plaintiff has not alleged an adverse employment action will be denied.

### B. Other alleged adverse actions

Plaintiff also alleges that "banishing" him from UNM premises, initiating an ad hoc

---

[11]  Plaintiff also alleges that "prolonged placement on administrative leave threatens to erode his technical skills as a head and neck surgeon" and "threatens his ability to maintain his medical license."  Allegations of possible future harm are insufficient to constitute an adverse employment action.

[12]  In arguing that Plaintiff's paid administrative leave does not constitute an adverse employment action, Defendants rely upon *Whitaker v. San Jon Schools*, CIV 04-1237 JB/WDS, 2006 WL 1308234 (D.N.M. April 19, 2006).  In *Whitaker,* the court held that a two-month suspension with pay pending an investigation did not constitute an adverse action.  Notably, however, the *Whitaker* court based its ruling, in part, on the relatively short duration of the suspension.  *Id*. at *8 (noting that plaintiff was not away from work for a long period of time).

professional review investigation, excluding him from performing his usual and customary work as a head and neck surgeon, threatening his job, and creating a hostile work environment constitute adverse employment actions.  As discussed above, neither initiating an investigation into alleged misconduct nor placing an employee on paid administrative leave pending this investigation, standing alone, is an adverse employment action.  *See also Cardenas-Garcia v. Tex. Tech Univ.*, 118 Fed. Appx. 793, 794 (5th Cir. 2004) (disciplinary investigation not adverse employment action); *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) (collecting cases in which the courts held that neither an internal investigation into suspected wrongdoing by an employee nor that employee's placement on paid administrative leave pending the outcome of such an investigation constitutes an adverse employment action).  "Banishing" plaintiff from UNM premises and relieving him of his job duties are necessary consequences of imposing a period of paid administrative leave pending an investigation and, as such, cannot be adverse employment actions.

Plaintiff alleges that Defendants Wernly and Spafford threatened Plaintiff's job when Plaintiff told them about the incident at the VA that resulted in officials at the VA requesting that Plaintiff never return to the VA hospital.  Plaintiff also alleges that Defendant Spafford told Plaintiff that the discrimination complaint he filed against the VA would jeopardize his job. While the Tenth Circuit has never found that an unrealized threat of termination constitutes an adverse employment action, it has recognized that under certain circumstances it could.  *See, e.g., Jeffries v. State of Kansas*, 147 F.3d 1220, 1232 (10th Cir. 1998)(finding an adverse employment action on other grounds but suggesting that if certain special circumstances exist, such as a unique interpersonal or educational relationship between the supervisor and employee, an unrealized threat of termination may constitute an adverse employment action).  Absent any

special circumstances, an isolated threat or proposal of a potentially adverse action is not, in and of itself, materially adverse. *See Wells v. Colo. Dep't of Transp*., 325 F.3d 1205, 1214 (10th Cir. 2003) (threat to transfer employee did not adversely affect plaintiff's employment); *Sanchez v. Denver Pub. Schs*., 164 F.3d at 533 (holding that "unsubstantiated oral reprimands" do not constitute an adverse employment action "absent evidence that they had some impact on the employee's employment status.").

In this case, Plaintiff has not alleged that any special circumstances exist.  Absent unique circumstances, an unrealized threat of termination is not an adverse employment action.  *See, e.g., Cole v. Ruidoso Municipal Schools,* 43 F.3d 1373, 1381 (10th Cir. 1994) (principal's statement, made after a teacher had filed a charge of discrimination with the EEOC, that the teacher's performance would be evaluated more often than other teachers of the same experience level was not an adverse employment action because "there was no suggestion that the requirement was ever adopted or carried out.");  *Hollins v. Atlantic Co., Inc*., 188 F.3d 652 (6th Cir. 1999) (an employer's unfulfilled threat to transfer or terminate employment is insufficient, as a matter of law, to constitute an adverse employment action); *Mattern v. Eastman Kodak Co*., 104 F.3d 702, 708 (7th Cir. 1997) (verbal threat of termination does not constitute adverse employment action).

Plaintiff also asserts, without any explanation, that the creation of a hostile work environment constitutes an adverse action.  Plaintiff does not cite any specific facts in support of his assertion of the existence of a hostile work environment and does not specify whether the hostile work environment occurred at the VA or at UNM.

A hostile work environment may constitute an adverse employment action for the purposes of establishing a *prima facie* case of employment discrimination.  *See, e.g., Harris v. Forklift*

21

*Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367 (1993)("When the workplace is permeated with

'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter

the conditions of the victim's employment and create an abusive working environment,' Title VII

is violated.")(citations omitted);  *Gunnell v. Utah Valley State Coll*., 152 F.3d 1253, 1264-65

(10th Cir. 1998) (recognizing that sufficiently severe co-worker hostility or retaliatory

harassment may constitute an adverse employment action for purposes of a retaliation claim if

management orchestrates or knowingly acquiesces in the harassment); *Faragher v. City of Boca

Raton*, 524 U.S. 775, 786-88 (1998) (holding that harassment that is severe and pervasive is

deemed to affect a term, condition, or privilege of employment).   To establish a *prima facie* case

of hostile work environment, a plaintiff must show: (1) discriminatory harassment that was

"sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment," and (2) a specific basis  for imputing the objectionable conduct

to the employer.  *Perry v. Ethan Allen, Inc*., 115 F.3d 143, 149 (2d Cir.1997).  The plaintiff must

show not only that he subjectively perceived the environment to be abusive but also that the

environment was objectively hostile.  *See Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir.

2006); *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004).

The first element of the *prima facie* case must be established by a showing that "the

workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that

the terms and conditions of [the plaintiff's] employment were thereby altered." *Alfano v.

Costello*, 294 F.3d 365, 373 (2d Cir. 2002); *see also Marrero v. Goya of Puerto Rico, Inc*., 304

F.3d 7, 26 (1st Cir. 2002) (To prove that a hostile work environment constituted "adverse

employment action," the plaintiff must show that the harassment she complains of was "so

severe or pervasive that it alters the conditions of the plaintiff's employment.").  Isolated

incidents typically will not create a hostile work environment, unless the incidents are so severe that they alter the terms and conditions of employment.  *See, e.g., Demoret*, 451 F.3d at 149; *Patterson v. County of Oneida*, 375 F.3d 206, 227 (2d Cir. 2004).  "Generally, 'incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Demoret*, 451 F.3d at 149 (quoting *Alfano*, 294 F.3d at 374); *see also National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115, 122 S.Ct. 2061 (2002) ("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct.").

In analyzing a hostile work environment claim, courts consider the totality of the circumstances, taking into account a variety of factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance" *Harris,* 510 U.S. at 23.

In his Second Amended Complaint, Plaintiff alleges that staff at the VA discriminated against him based on his nationality and race by arbitrarily and unilaterally canceling his surgeries with short notice and by, on at least one occasion, referring to him as a "rag head."[13] Plaintiff asserts that these actions affected his ability to effectively provide medical care. Plaintiff further alleges that he reported the discrimination to his supervisors but no action was taken.

---

[13]  Other than the allegations that two defendants threatened to terminate him, which are discussed above, Plaintiff's allegations against the individual defendants are focused on his placement on administrative leave and the initiation and conduct of an investigation into his professionalism and performance.  As Plaintiff was on administrative leave for the bulk of this time period, any of the challenged actions of the Defendants could not form the basis for a hostile work environment.  Furthermore, Plaintiff makes no specific allegations regarding his working conditions other than those discussed above at the VA.

These allegations do not rise to the level of substantiality necessary to demonstrate a hostile work environment.  The allegation that staff at the VA canceled some of Plaintiff's scheduled surgeries with short notice is a mere inconvenience that does not rise to the level of an adverse employment action.  *See, e.g., Dick,* 397 F.3d at 1268 (adverse employment action will not be recognized for mere inconvenience in hostile work environment claim).  While Plaintiff alleges that these actions interfered with his ability to effectively provide medical care to his patients, he does not allege that these actions affected his job.  In fact, Plaintiff received a successful employment evaluation in December of 2005, which, according to the Second Amended Complaint, was after the VA staff began canceling some of Plaintiff's scheduled surgeries with short notice.  *See* Second Amended Complaint at ¶ 20 (alleging that the discrimination at the VA began "shortly after Dr. Ishoo started work" in September 2005).  Plaintiff does not allege that he suffered any change in his employment status as a result of the alleged harassment by the staff at the VA.  There are no allegations that the actions complained of affected the likelihood that Plaintiff would be terminated, undermined his position, or affected his future employment opportunities.  *See Medina v. Income Support Div.*, 413 F.3d 1131, 1137 (10th Cir. 2005).  Furthermore, canceling some of Plaintiff's scheduled surgeries was not offensive, physically threatening, or humiliating.

The fact that an unidentified nurse at the VA referred to Plaintiff as a "rag head" on one occasion, while offensive, is an isolated incident that does not rise to the level of pervasive or severe as necessary to allege a hostile work environment.  *See, e.g., Demoret*, 451 F.3d at 149 (isolated incidents typically will not create a hostile work environment, unless the incidents are so severe that they alter the terms and conditions of employment); *Landgraf v. USI Film Prods*., 511 U.S. 244, 286 (1994) (to fulfill his burden under the pervasiveness standard, the "plaintiff

must show more than a few isolated incidents of racial enmity.").

The allegations in the Second Amended Complaint that Defendants instituted an investigation of Plaintiff, "banished" Plaintiff from UNM premises during the investigation, excluded Plaintiff performing his usual and customary work as a head and neck surgeon during the investigation, and threatened his job on two occasions, are insufficient to constitute adverse employment actions for the purposes of establishing a *prima facie* case of employment discrimination.  In addition, Plaintiff's allegations do not establish a hostile work environment claim.  Absent allegations establishing an adverse employment action, Plaintiff's employment discrimination claim fails.

## V.  Title VII Retaliation Claim

Title VII makes it unlawful to retaliate against any employee because he has "opposed" any practice made unlawful by Title VII.  42 U.S.C. § 2000e-3(a).  Defendants assert that Plaintiff has failed to state a retaliation claim under the Human Rights Act and Title VII because there has been no adverse action.  The Supreme Court recently held that the determination of what constitutes an adverse action may be different for retaliation claims than for discrimination claims.  *See Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006) ("Title VII's substantive provision and its anti-retaliation provision are not coterminous.  The scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm.").  In order to state a Title VII retaliation claim, a plaintiff need only show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id*. (internal quotes and citations omitted).

For the same reasons the Court found that indefinite paid administrative leave could

constitute an adverse employment action for purposes of a discrimination claim, indefinite paid administrative leave could also "dissuade a reasonable worker from making or supporting a charge of discrimination." *Id*.  Consequently, Plaintiff has sufficiently alleged an adverse employment action in support of his retaliation claims under Title VII and the New Mexico Human Rights Act.

In addition, while the alleged threats by Defendants Spafford and Wernly to terminate Plaintiff did not constitute an adverse action for purposes of a discrimination claim, one of the threats does constitute an adverse action for purposes of a Title VII retaliation claim.  The first threat to Plaintiff's job occurred when Plaintiff told his supervisors about the February 24, 2006 event at the VA that resulted in the VA requesting that Plaintiff leave the hospital and never return.  Plaintiff does not allege that this threat to his job was related in any way to his previous complaints of discrimination or was intended to deter him from filing a claim of discrimination. The second threat to Plaintiff's job, however, occurred when he informed Defendant Spafford that he had filed a claim of discrimination against the VA.  According to the Second Amended Complaint, Defendant Spafford told Plaintiff that filing the discrimination complaint would jeopardize his job.  This threat is clearly linked to Plaintiff's protected act of filing a claim of discrimination and may constitute an adverse employment action.  *Belcher v. City of McAlester, Oklahoma*, 324 F.3d 1203, 1207 n. 4 (10th Cir. 2003) (noting that "threats of dismissal based on an employee's speech may constitute adverse employment action").

## VI.  Conspiracy Claim

Defendants assert that Plaintiff's conspiracy claim under Section 1985(3) and Section 1986 is conclusory and must be dismissed.  Section 1985(3) provides:

If two or more persons . . . conspire . . . for the purpose of depriving . . . any

> person . . . of the equal protection of the laws, or of equal privileges and
> immunities under the laws; . . . or cause to be done, any act in furtherance of the
> object of such conspiracy . . . the party so injured or deprived may have an action
> for the recovery of damages . . ..

42 U.S.C. § 1985(3).

To establish a claim under this statute, a plaintiff must show: (1) a conspiracy; (2) to deprive a person of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) a resulting injury or deprivation. *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971). Section 1985(3) "does not 'apply to all tortious, conspiratorial interferences with the rights of others,' but rather only to conspiracies motivated by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'" *Tilton v. Richardson,* 6 F.3d 683, 686 (10th Cir. 1993) (citing *Griffin,* 403 U.S. at 102).

The Tenth Circuit has recognized that "[d]irect evidence of a conspiracy is rarely available, and the existence of a conspiracy must usually be inferred from the circumstances." *Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir. 1980) (citing *Loew's, Inc. v. Cinema Amusements*, 210 F.2d 86, 93 (10th Cir. 1954)). But a plaintiff must bring forth "more than mere conclusory allegations" to establish a claim under § 1985. *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1126 (10th Cir. 1994).

In this case, Plaintiff does not make any direct allegations of a conspiracy; rather, Plaintiff infers from the acts taken by the individual defendants that a conspiracy existed. In his response to the motions to dismiss, Plaintiff does not point to any specific allegations in the Second Amended Complaint that would support the inference of a conspiracy. Instead, Plaintiff merely states that the factual allegations in his complaint "portray a conspiracy among the UNM Defendants to deprive Dr. Ishoo of his rights." Plaintiff has wholly failed to carry his burden of

27

alleging the facts necessary to support a claim of conspiracy.  Plaintiff does nothing more than allege that individual defendants took certain actions, the net result of which was the formation of an AHIC and the imposition of a paid suspension pending an investigation into allegations of misconduct.  There is nothing in the Second Amended Complaint that supports an inference that the actions were in any way part of a concerted effort by the individual defendants to deprive Plaintiff of equal protection or equal privileges and immunities.

Since a § 1986 claim is premised upon the existence of a valid § 1985 claim, Plaintiff's § 1986 claim also fails. *See Abercrombie v. City of Catoosa*, 896 F.2d 1228, 1230 (10th Cir. 1990).

## VII.  Injunctive Relief

Defendants contend that Plaintiff's injunctive relief claim contains only conclusory allegations that cannot withstand a motion to dismiss.  In Count VII, Plaintiff appears to seek a preliminary injunction.[14]  *See* Complaint at ¶ ¶ 117-120 (setting out the standard for a preliminary injunction).  An injunction may be issued as a temporary remedy for certain breaches of common law, statutory, or constitutional rights. Granting such injunctions fall within the long-recognized, inherent equitable powers of the court.  *See ITT Comm. Devel. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978) ("[A] federal court, sitting in equity, possesses all of the common law equity tools of a Chancery Court (subject, of course, to congressional limitations) to process litigation to a just and equitable conclusion.").  In determining whether, in the interests of effective justice, an injunction should issue, the Court must consider four factors:

---

[14]  A plaintiff need not include a preliminary injunction count in a complaint in order to obtain such relief.  Regardless of whether the complaint includes a preliminary injunction count, a plaintiff, in order to obtain a preliminary injunction, must file a motion with the Court requesting this relief.

(1) whether the moving party will suffer irreparable injury unless the injunction issues; (2) whether the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; (3) whether the injunction is adverse to the public interest; and (4) whether there is a substantial likelihood that the moving party will eventually prevail on the merits. *See Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980); *Dominion Video Satellite, Inc. v. Echostar Satellite Corp*., 269 F.3d 1149, 1154 (10th Cir. 2001).

Defendants assert that there is no substantial likelihood that Plaintiff will prevail because he has not stated a claim. As the fourth factor makes clear, any motion or suit for a traditional injunction must be predicated upon a cause of action regarding which a plaintiff must show a likelihood of success on the merits. Thus, for an injunction to be even theoretically available, a plaintiff must be able to articulate a basis for relief that would withstand a motion to dismiss for failure to state a claim. *See, e.g., Paisey v. Vitale*, 807 F.2d 889, 892 (11th Cir. 1986) ("[T]he district court did not err in denying [the plaintiff's] motion for a preliminary injunction and dismissing the injunctive count of [the plaintiff's] complaint because [the plaintiff] has failed to state a claim for relief...."). As discussed above, Plaintiff's Complaint asserts at least one claim for relief. As such, an injunction is theoretically available.

Next, Defendants also argue that precluding an employer from investigating allegations of misconduct would clearly be contrary to the public interest such that an injunction prohibiting an investigation would not be available. Defendants overlook, however, the fact that there is also a public interest in conducting such investigations in a timely manner. It is not in the public's interests to keep a qualified physician on paid leave for longer than necessary to conduct the investigation. Consequently, the Court cannot find, as a matter of law, that an injunction is unavailable and this count will not be dismissed. The Court, however, will dismiss this count as

to all defendants who have no other counts remaining against them because Plaintiff can obtain the relief sought--a preliminary injunction--without the presence of these defendants.

## VIII.  Due Process Claims

In Count V, Plaintiff appears to assert both procedural and substantive due process claims under Section 1983.  Count V is virtually incomprehensible and Plaintiff's responses to the motions to dismiss do little to elucidate the bases for his due process claims.  Nevertheless, the Court will attempt to determine if Plaintiff has alleged potentially viable due process claims.

### A.  Procedural Due Process

The Fourteenth Amendment protects citizens from the deprivation of "life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV, § 1.  "[P]rocedural due process ensures that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision."  *Archuleta v. Colo. Dep't of Insts., Div. of Youth Servs.*, 936 F.2d 483, 490 (10th Cir. 1991).  To determine whether a plaintiff was denied procedural due process, the Court engages in a two-step inquiry: (1) did the individual possess a protected interest to which due process protection was applicable; and, if so, (2) was the individual afforded an appropriate level of process.  *See Hennigh v. City of Shawnee,* 155 F.3d 1249, 1253 (10th Cir. 1998).  Of course, implicit in this test is the assumption that a plaintiff was deprived of a protected interest to which due process protection applied.

An employee possesses a property interest in public employment only if he has tenure, a contract for a fixed term, or if state law allows dismissal only for "cause" or its equivalent.  *See Bd. of Regents v. Roth*, 408 U.S. 564, 576-77, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Greene v. Barrett*, 174 F.3d 1136, 1140-41 (10th Cir.1999).  Defendants do not contest that Plaintiff, who has an employment contract for a fixed term, has a protected property interest in his

employment.  Defendants do contend, however, that Plaintiff cannot state a procedural due process claim because Plaintiff has not been terminated and, thus, has not been deprived of any property interest in his employment.  In response, Plaintiff asserts that his procedural due process rights were violated when he was placed on administrative leave and not permitted to work.  *See* Plaintiff's Response in Opposition to Defendants UNM, Roth, Wernly, Spafford, Hashimoto, and Bailey's Second Motion to Dismiss at p. 18 (asserting that Plaintiff has stated a procedural due process claim because being "placed on administrative leave is not to be allowed to suffer or be permitted to work.").  Both the Supreme Court and the Tenth Circuit have held that suspension with pay does not implicate due process.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545-546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (stating that employers may avoid due process concerns in cases in which immediate suspension of an employee is necessary by placing that employee on paid, rather than unpaid, leave); *Hicks v. City of Watonga*, 942 F.2d 737 (10th Cir. 1991) ("Suspension with pay does not raise due process concerns.");  *Pitts v. Board of Educ.*, 869 F.2d 555, 556 (10th Cir.1989) ("suspension with pay [does] not invade any recognized property interest.").[15]

---

[15]  Numerous other courts similarly have held that suspension with pay does not deprive an employee of a property right that is protected by the Fourteenth Amendment of the U.S. Constitution. *See Edwards v. Cal. Univ. of Penn.*, 156 F.3d 488, 492 (3d Cir. 1998) (placing tenured professor on paid leave did not implicate due process concerns);  *Huang v. Board of Governors of University of North Carolina*, 902 F.2d 1134, 1141 (4th Cir. 1990) ("We are convinced that any constitutionally protected property interest [an employee has] as a result of his employment contract [is] satisfied by payment of the full compensation due under the contract."); *Mansoor v. County of Albemarle*, 124 F.Supp.2d 367, 379 (E.D. Va. 2000) (under the federal standard of what process is due, the plaintiff's suspension with pay did not violate the Fourteenth Amendment, even if it was a "suspension... for punitive reasons"); *Wasson v. Sonoma County Junior Coll. Dist.*, 4 F.Supp.2d 893, 906 (N.D. Cal. 1997) (employee placed on administrative leave "cannot claim that she was deprived of a property interest in her employment, as a matter of law"); *Koelsch v. Town of Amesbury*, 851 F.Supp. 497, 500 (D. Mass. 1994) (finding "[a] public employee's suspension with pay does not implicate a

Plaintiff's argument that his paid administrative leave implicates due process because he was not permitted to perform the functions of his job is soundly rejected by the Supreme Court and Tenth Circuit cases holding that a suspension with pay does not implicate due process because, by definition, an employee on administrative leave is not performing the functions of his job.  In addition, Plaintiff has not cited any case law in support of this argument.  Indeed, the case law the Court located was to the contrary.  *See, e.g., Royster v. Board of Trustees of Anderson County Sch. Dist. Number 5*, 774 F.2d 618, 621 (4th Cir. 1985) (public employee's property interest does not extend to "the right to actively engage in and execute the duties of [an] office"); *Harrington v. Lauer*, 888 F.Supp. 616, 620 (D.N.J. 1995) (holding that although appellant "had a protected property interest in the right to receive the full amount of compensation provided for in his contract, he did not have a protected property interest in the right to execute his duties as superintendent for the duration of his contract"); *City of Annapolis v. Rowe*, 123 Md. App. 267, 292, 717 A.2d 976, 988 (1998) (holding that suspended employee had no constitutionally protected property interest in actually performing job); *Gates v. Sicaras*, 706 F.Supp. 169, 172-73 (D. Conn. 1989) (stating that "[p]laintiff fails, however, to offer any evidence pointing to a claim of entitlement to such benefits of employment beyond his regular salary").  Accordingly, under Tenth Circuit law, Plaintiff was not entitled to due process protections (*i.e.* an explanation of the employer's evidence, adequate notice and an opportunity to be heard) prior to being suspended with pay and Defendants' request for dismissal of

---

constitutionally protected property interest"); *Hunt v. Prior*, 236 Conn. 421, 673 A.2d 514, 524 (1996) (holding that a suspension with pay did not carry constitutional ramifications because plaintiff did not prove that he was entitled to anything but his salary); *Bd. of Educ. v. Harrell*, 118 N.M. 470, 882 P.2d 511 (1994) (holding that a suspension with pay does not violate any recognized property interest).

Plaintiff's procedural due process claim will be granted.[16]

## B.  Substantive Due Process

"[P]rocedural due process ensures that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision; substantive due process, on the other hand, guarantees that the state will not deprive a person of those rights for an arbitrary reason regardless of how fair the procedures are that are used in making the decision." *Archuleta v. Colorado Dep't of Insts., Div. of Youth Servs.*, 936 F.2d 483, 490 (10th Cir. 1991). A substantive due process claim requires assessing whether a governmental action is arbitrary, without a rational basis, or shocks the conscience. *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 528 (10th Cir. 1998); *Butler v. Rio Rancho Publ. Schs. Bd. of Educ.*, 341 F.3d 1197, 1200-01 (10th Cir. 2003).  Substantive due process claims are not based on state law but are founded upon "deeply rooted notions of fundamental personal interests derived from the Constitution." *Mangels v. Pena,* 789 F.2d 836, 839 (10th Cir. 1986); *see also United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ("'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' or interferes with rights 'implicit in the concept of ordered liberty'")(internal citations omitted)).

Plaintiff has a protected property interest in continued employment.  Although this interest

---

[16]  While at least one court has held that a lengthy and open-ended suspension may implicate a property interest in employment, Plaintiff does not make this argument.  *See, e.g., Torres-Rosado v. Rotger-Sabat*, 335 F.3d 1, n.8, (1st Cir. 2003) ("it is conceivable that a very long or open-ended paid suspension might function so much like a termination that some due process protection might attach").  Even if Plaintiff's Second Amended Complaint was construed as making such an argument, Defendants would be entitled to qualified immunity because the law on this issue is not clearly established.  *See Farmer v. Perrill*, 288 F.3d 1254, 1259 (10th Cir. 2002) (the law is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains).

is protected by procedural due process, it is unclear whether it is also protected by substantive

due process.  Neither the Supreme Court nor the Tenth Circuit has determined whether a

state-law contract right is a property right entitled to the protection of substantive due process.[17]

*See Archuleta v. Colorado Dep't of Insts*., 936 F.2d 483, 489 n. 6 (10th Cir. 1991).

Even assuming that Plaintiff does have a fundamental property interest in performing the

duties and functions of his employment that is subject to substantive due process protection,

Plaintiff's substantive due process claim still fails.  Plaintiff's substantive due process claim

essentially restates his other constitutional claims.  Where a plaintiff has recourse to an "explicit

textual source of constitutional protection," *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct.

1865, 104 L.Ed.2d 443 (1989), a more general claim of substantive due process is not available.

*See County of Sacramento v. Lewis*, 523 U.S. 833, 842, 118 S.Ct. 1708, 140 L.Ed.2d 1043

(1998); *Dubbs v. Head Start, Inc*., 336 F.3d 1194, 1203 (10th Cir. 2003); *see also Eby-Brown*

*Co., LLC v. Wisconsin Dep't of Agriculture*, 295 F.3d 749, 754 (7th Cir. 2002)(claims of alleged

unequal treatment properly analyzed under the Equal Protection Clause, not as substantive due

process claims); *Gehl Group v. Koby*, 63 F.3d 1528, 1539 (10th Cir. 1995)(claims regarding

alleged racially discriminatory animus should be analyzed under explicit guarantees of Equal

---

[17]  Federal circuit courts of appeal are split as to whether there is a substantive due process right in public employment. *Compare McKinney v. Pate*, 20 F.3d 1550, 1560 (11th Cir. 1994) (en banc) (finding no such right), cert. denied, 115 S.Ct. 898 (1995), with *Schaper v. City of Huntsville*, 813 F.2d 709, 717 & n. 8 (5th Cir. 1987) (recognizing substantive due process right in public employment).  The Tenth Circuit has not spoken directly to the issue, and other district courts within the circuit have reached divergent conclusions based on Tenth Circuit precedents. *Compare Pike v. Gallagher,* 829 F.Supp. 1254, 1278-79 & n. 21 (D.N.M. 1993) (recognizing substantive due process right in employment), with *Houck v. City of Prairie Village*, 978 F.Supp. 1397, 1405 (D. Kan. 1997) (finding no such right), *aff'd*, 166 F.3d 347 (10th Cir. 1998).

Protection Clause), implicitly overruled on other grounds by *Currier v. Doran*, 242 F.3d 905, 916 (10th Cir. 2001); *Curry v. Pulliam*, 234 F.Supp.2d 921, 927 (S.D. Ind. 2002) (holding that plaintiff who alleged race discrimination in the termination of his employment had no substantive due process claim because he had alleged a violation of the Equal Protection Clause); *Hogan v. State of Connecticut Judicial Branch*, 220 F.Supp.2d 111, 123 (D.Conn. 2002)(substantive due process claim alleging race discrimination in termination of employment "should be analyzed exclusively under the law of equal protection, not substantive due process."). Plaintiff's claims are properly analyzed under the more specific guarantees of the First Amendment and the Equal Protection Clause. Accordingly, Defendants' motion to dismiss Plaintiff's substantive due process claim will be granted.

### C. Liberty Interest

In Count VI, Plaintiff asserts that he has a liberty interest in his "employment, staff privileges, medical license and his ability to practice medicine" and that "as a proximate result of the individual Defendants' wrongful conduct, [Plaintiff] has been prevented from practicing medicine and his medical license is in jeopardy. Further, should the Defendants inform the NPDB of the adverse action they have taken against him or of any additional adverse action they may take, [Plaintiff's] liberty interest in future employment is jeopardized."

The Tenth Circuit recognizes a claim for infringement upon a plaintiff's "'liberty interest in [his] good name and reputation as it affects [his] property interest in continued employment.'" *Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1153 (10th Cir. 2001) (quoting *Workman v. Jordan*, 32 F.3d 475, 480 (10th Cir. 1994)); *see also Palmer v. City of Monticello*, 31 F.3d 1499, 1503 (10th Cir. 1994) ("[A]n accusation that a police officer falsified a speeding ticket qualifies as a stigmatizing charge which amply supports that element of a liberty interest

violation.").  A public employee's liberty interest, however, is limited.  To state a claim founded

on a liberty interest, an employee must show that a public employer took action to terminate an

employee based upon a public statement of unfounded charges of dishonesty or immorality that

might seriously damage the employee's standing or associations in the community and foreclose

the employee's freedom to take advantage of future employment opportunities.  *Palmer*, 31 F.3d

at 1503 (citation and internal quotation marks omitted); *see also Melton v. City of Oklahoma*

*City*, 928 F.2d 920, 927 (10th Cir. 1991) (stating the same requirement).

   To establish this type of liberty deprivation, a plaintiff must allege and prove that 1)

statements were made that impugned the good name, reputation, honor, or integrity of the

employee; 2) the statements were false; 3) the statements occurred in the course of terminating

the employee or foreclosed other employment opportunities; and 4) the statements must be

published.  *Workman,* 32 F.3d at 481 (citations omitted).  These elements are not disjunctive, all

must be satisfied to demonstrate deprivation of the liberty interest.  *Id.*

   In addition, the "concept of liberty protected by the due process clause has long included

occupational liberty-'the liberty to follow a trade, profession, or other calling.' " *Wroblewski v.*

*City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992). "The cases have consistently drawn a

distinction, however, between occupational liberty and the right to a specific job." *Id.*  "'It

stretches the concept too far to suggest that a person is deprived of "liberty" when he simply is

not rehired in one job but remains as free as before to seek another.'" *Id.* (quoting *Roth*, 408 U.S.

at 575, 92 S.Ct. 2701). "It is the liberty to pursue a calling or occupation, and not the right to a

specific job, that is secured by the Fourteenth Amendment." *Id.*

   "[T]he cases make clear that there is no deprivation of liberty if the employee is not fired,"

although a "significant demotion" to a "degradingly inferior" job could implicate a liberty

interest, such as where an employee is demoted from "a responsible and well-paid job to a menial and low-paying one." *Lawson v. Sheriff of Tippecanoe County*, 725 F.2d 1136, 1139 (7th Cir. 1984); *see also Gustafson v. Cornejo*, 117 F.3d 1015, 1020 (7th cir. 1997)(public employee may be deprived of a liberty interest if she is "demoted to a position 'far beneath the one [she] had' "). Even assuming that the suspension in this case could be considered the equivalent of a significant demotion, Plaintiff's liberty interest claim still fails on several grounds. First, Plaintiff has not alleged that any defendants made public statements disparaging plaintiff, much less asserted that these statements were false.[18]  *See Lancaster v. Indep. Sch. Dist. No. 5*, 149 F.3d 1228, 1235 (10th Cir. 1998) ("fatal to plaintiff's liberty interest claim is the fact that the defendants made no public statements disparaging [the plaintiff] or harming his standing or associations in the community. The Supreme Court has rejected the theory that the mere fact of dismissal, absent some publicizing of the reasons for the action, could amount to a stigma infringing one's liberty.")(internal quotation marks and emphasis omitted); *Dickeson v. Quarberg*, 844 F.2d 1435, 1440 (10th Cir. 1988) ("A liberty interest is not violated when one is discharged without public disclosure of the reasons for the discharge."). Second, Plaintiff has not alleged that any false statements were published.

Finally, Plaintiff's assertion that his medical license may be in jeopardy and his liberty interest in future employment may be damaged if Defendants inform the NPDB of any adverse actions is speculative and insufficient to support a liberty interest claim. *See Phelps v. Wichita*

---

[18]  In his Complaint, Plaintiff alleges that unidentified persons impugned his good name by stating he was a "trouble maker" and "under suspicion." Plaintiff does not allege that these statements were made by a defendant, were false, were published, occurred in the course of terminating his employment or foreclosed other employment opportunities. Absent such allegations, these statements are insufficient to state a liberty interest claim.

*Eagle-Beacon*, 886 F.2d 1262, 1269 (10th Cir.1989) (potential damage to prospective employment opportunities is too intangible to constitute a deprivation of a liberty interest).

Plaintiff has failed to state a liberty interest claim and Count VI will be dismissed as to all defendants.

## IX.   Qualified Immunity

Defendants assert that they are entitled to qualified immunity in their individual capacities. Section 1983 provides that "[e]very person" who acts under color of state law to deprive another of constitutional rights "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  Although this statute "on its face admits of no immunities," *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the Supreme Court has recognized several, including the doctrine of qualified immunity, which exempts government officials from suits for civil damages under certain circumstances.  This grant of immunity is intended to balance two concerns.  On one hand, when an official abuses his office, "an action for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).  On the other hand, exposing government officials to damages suits "entail[s] substantial social costs," *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), such as "the expenses of litigation, the diversion of official energy from pressing public issues, ... the deterrence of able citizens from acceptance of public office ... [and the deterrence of public officials from] 'the unflinching discharge of their duties.'" *Harlow*, 457 U.S. at 814.

The Supreme Court has attempted to strike the balance between these two concerns by shielding government officials from suits for civil damages "insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would

have known." *Id*. at 818.  Although courts have derived from this statement a variety of

multi-part tests, the essential inquiry is whether an objectively reasonable official would have

known that his conduct was unlawful.  *See Anderson*, 483 U.S. at 640.  The Tenth Circuit

employs a three-step inquiry.  *See Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1239-40,

1247, 1251 (10th Cir. 2003).  First, the court determines "whether the plaintiff's allegations, if

true, establish a constitutional violation." *Id*. at 1239- 40.  If not, the suit is dismissed; if so, the

court moves to the second step: "whether the law was clearly established at the time the alleged

violations occurred." *Id*. at 1247.  This step gives the official an opportunity to show that he

"neither knew nor should have known of the relevant legal standard" because the law was not

clearly established at the time he acted.  *Harlow*, 457 U.S. at 819.  Where the law is not clearly

established, courts do not require officials to anticipate its future developments, and qualified

immunity is therefore appropriate.  The contours of the right must be sufficiently clear that a

reasonable official would understand that what he is doing violates that right.  This is not to say

that an official action is protected by qualified immunity unless the very action in question has

previously been held unlawful, but it is to say that in the light of pre-existing law the

unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. at 639-40 (quoting *Harlow,*

457 U.S. at 818-19) (citations omitted).  The law is clearly established when a Supreme Court or

Tenth Circuit decision is on point, or if the clearly established weight of authority from other

courts shows that the right must be as plaintiff maintains.  *Farmer,* 288 F.3d at 1259.  "Once a

defendant raises the defense of qualified immunity as a defense to an action, '[t]he plaintiff

carries the burden of convincing the court that the law was clearly established.'"  *Powell v.*

*Mikulecky*, 891 F.2d 1454, 1457 (10th Cir. 1989) (quoting *Pueblo Neighborhood Health*

39

*Centers, Inc. v. Losavio*, 847 F.2d 642, 645 (10th Cir. 1988)).

If the law was clearly established, the court reaches the third step of the inquiry: whether, in spite of the fact that the law was clearly established, "extraordinary circumstances"--such as reliance on the advice of counsel or on a statute--"so 'prevented' [the official] from knowing that his actions were unconstitutional that he should not be imputed with knowledge of a clearly established right." *Roska*, 328 F.3d at 1251. This occurs only rarely. *Id*. The defendant bears the burden of proving such circumstances. *Pleasant v. Lovell*, 876 F.2d 787, 794 (10th Cir. 1989). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors." *Harlow,* 457 U.S. at 818-19.

Defendants argue that if paid administrative leave is found to be an adverse employment action, the law was not clearly established and they are entitled to qualified immunity. The Court agrees. Whether paid administrative leave that is longer than necessary to resolve the underlying issue can rise to the level of a constitutional violation is a matter of first impression in the Tenth Circuit and the Supreme Court. The majority of circuits have held that paid administrative leave pending a timely investigation into the underlying issues does not constitute a constitutional violation. It does not appear, however, that any circuit has directly addressed the question of whether paid administrative leave pending a dilatory investigation can rise to the level of a constitutional violation. Because this is a matter of first impression, the law was not clearly established and qualified immunity is appropriate on all claims relying upon the

imposition of paid administrative leave as an adverse action.

**X.    Qualified Immunity under the Health Care Quality Improvement Act**

The Health Care Quality Improvement Act ("HCQIA") was designed both to provide for

effective peer review and interstate monitoring of incompetent physicians and to grant qualified

immunity from damages for those who participate in peer review activities. *See* 42 U.S.C. §

11101.  In furtherance of the latter goal, HCQIA provides that, if a "professional review action"

(as defined in HCQIA) meets certain due process and fairness requirements, then those

participating in such review "shall not be liable in damages under any law of the United States or

of any State (or political subdivision) with respect to the action." 42 U.S.C. § 11111.  This

section excludes from its coverage suits brought under 42 U.S.C. § 1983 or Title VII of the Civil

Rights Act of 1964.  *Id.*

Plaintiff asserts that under the HCQIA, Defendants are not entitled to qualified immunity

and seeks sanctions against Defendants for "intentionally misus[ing] the HCQIA as a cloak and

dagger."  Defendants, however, have invoked constitutional qualified immunity under Section

1983, not HCQIA qualified immunity.  Plaintiff apparently interprets the HCQIA qualified

immunity provisions as abrogating constitutional qualified immunity.  The Court can find no

support for such a striking proposition.

In making this argument, Plaintiff cites to a case in the Western District of North Carolina

where a court appears to have denied a defendant constitutional qualified immunity on the

grounds that the HCQIA qualified immunity did not extend to actions for damages for civil

rights violations.  In *Braswell v. Haywood Reg'l Med. Ctr.*, 352 F.Supp. 2d 639 (W.D. N.C.

2005), the court first acknowledged the existence of constitutional qualified immunity. *Id.* at 650

("While § 1983 "on its face admits of no immunities [,] ... [the courts] have accorded certain

government officials [with] ... qualified immunity from suit if the tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that Congress would have specifically so provided had it wished to abolish the doctrine.").  Next the court correctly noted that HCQIA qualified immunity did not extend to damages actions under the civil rights statutes.  *Id*.  ("Congress specifically provided that qualified immunity did not extend to actions for damages for violations of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et. seq*, and the Civil Rights Act, 42 U.S.C. §§ 1981, *et. seq*. *See*, 42 U.S.C. § 11111(a)(1).).  Then, without any further analysis, the court appears to have concluded that constitutional qualified immunity was not available because HCQIA qualified immunity was not available.  *Id*. ("[t]herefore, under Congress' explicit exclusion, Defendant is not entitled to qualified immunity with respect to Plaintiff's § 1983 claims alleging violations of his First Amendment and due process rights.").  In support of this assertion, however, the court cited cases holding only that HCQIA qualified immunity is not available for actions alleging civil rights violations.[19]  To further confuse matters, later in the opinion, the court characterizes its holding as only that HCQIA qualified immunity was unavailable.  *Id*. at 651 ("While the Court has determined that the HCQIA qualified immunity is not applicable to Plaintiff's § 1983 claims, it still may be available to the Defendants against the Plaintiff's state law claims.").  In short, not only is

_____

[19]  *Braswell* cited the following cases in support of its holding:  "*Austin v. McNamara*, 979 F.2d 728, 733 (9th Cir. 1992) ("[ 42 U.S.C. § 11111] excludes from its coverage suits brought under 42 U.S.C. § 1983 [.]"); *Reyes v. Wilson Mem'l Hosp*., 102 F.Supp.2d 798, 821 (S. D. Ohio 1998) ("Because the HCQIA does not provide any immunity from damages for violations of § 1983, the Court must conclude that HCQIA immunity does not attach to Count Two."); *Rogers v. Columbia/HCA of Cent. Louisiana, Inc*., 971 F.Supp. 229, 237 (W.D. La. 1997) ("HCQIA immunity does not shield the defendants from liability for violating the United States Constitution."); *Johnson v. Greater Southeast Cmty. Hosp. Corp*., 1996 WL 377147, at *4 (D.D.C. 1996) ( "[ 42 U.S.C. § 11111] excludes from its coverage civil rights suits brought under 42 U.S.C. § 1983 or Title VII of the Civil Rights Act of 1964 . . .")."

*Braswell* not binding on this Court, but its analysis is incomplete, at best, and certainly not persuasive.

The plain language of the HCQIA does not eliminate constitutional qualified immunity for state actors who participate in actions covered by the HCQIA and such a holding would be contrary to HCQIA's stated purpose of encouraging effective peer review and interstate monitoring of incompetent physicians. While Defendants are not entitled to HCQIA's qualified immunity (and, in fact, they have not asserted any such immunity), they are entitled to assert constitutional qualified immunity. Plaintiff's requests for sanctions based on Defendants' assertion of qualified immunity are without merit and will be denied.

## XI. Rule 56(f) Affidavit

In addition to filing responses to the motions to dismiss, Plaintiff also filed a Rule 56(f) affidavit stating that discovery was necessary to respond to the motions. Defendants moved to strike this affidavit because it does not comply with the requirements of Rule 56(f) and because their motions to dismiss accept all Plaintiff's well-pled allegations as true so there is no basis for a request for discovery at this stage. The Court agrees. Defendants' motions to dismiss assume all well-pled factual allegations as true and do not reference any materials outside the Second Amended Complaint. Consequently, there are no factual disputes and no need for discovery to respond to the motions.

## <u>CONCLUSION</u>

**IT IS THEREFORE ORDERED** that Defendants Board of Regents of the University of New Mexico, Paul Roth, Jorge Wernly, Michael Spafford, Fred Hashimoto, and Robert Bailey's Motion to Dismiss Plaintiff's Second Amended Complaint on the Basis of Qualified Immunity and Other Grounds, filed October 10, 2006, **[Doc. No. 28]** is **GRANTED in part** as follows:

\*      All claims against Defendant Board of Regents are dismissed without prejudice based on 11th Amendment immunity. Because Plaintiff's Title VII claims in Counts X and XI are brought solely against Defendant Board of Regents, these two counts are dismissed without prejudice in their entirety.

\*      All claims against the individual defendants in their official capacities are dismissed based on 11th Amendment immunity.

\*      All Section 1983 claims against the individual defendants in their official capacities are dismissed.

\*      All claims against Defendant Paul Roth, Defendant Fred Hashimoto, and Defendant Robert Bailey are dismissed without prejudice for failure to state a claim.

\*      Count VI is dismissed in its entirety for failure to state a claim.

\*      The substantive due process claim in Count V is dismissed for failure to state a claim.

\*      All individual defendants are entitled to qualified immunity for Counts II, IV, VII, IX, X and XI to the extent an action under these counts relies upon the imposition of a paid suspension as an adverse employment action.

**IT IS FURTHER ORDERED THAT** Defendant Sauder's Second Motion to Dismiss, filed October 10, 2006, **[Doc. No. 32]**, is **GRANTED**. All claims against Defendant Scot Sauder are hereby dismissed.

**IT IS FURTHER ORDERED THAT** Plaintiff's requests for sanctions in his responses to the motions to dismiss are denied as without merit.

**IT IS FINALLY ORDERED THAT** Plaintiff's Motion to File Surreply, filed

44

November 14, 2006, **[Doc. No. 53]**, is **DENIED**, Defendants' Motion to Strike Plaintiff's Rule

56 Affidavit, filed October 10, 2006, **[Doc. No. 27]**, is **DENIED as moot**, and Defendants'

Motion to Strike Plaintiff's Second Rule 56 Affidavit, filed November 10, 2006, **[Doc. No. 48]**,

is **GRANTED**.

Dated this 29th day of September, 2007.

_____

MARTHA VÁZQUEZ
U. S. DISTRICT COURT JUDGE

Attorney for Plaintiff:
  J. Edward Hollington, Esq.

Attorney for Defendants:
  Terrill E. Pierce , Esq.
  Elizabeth L. German, Esq.

Attorney for Defendant Scot Sauders:
  Ruth Fuess , Esq.